**IN THE UNITED STATES DISTRICT COURT FOR**
**THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| **ODELIA A. GONZALES**, and<br>**DOMINGO GONZALES**<br>Plaintiffs<br>vs.<br>**UNITED STATES OF AMERICA**,<br>Defendant | **No. 5:26-CV-05410** |

## ORIGINAL COMPLAINT

1.1. Plaintiffs Odelia A. Gonzales and Domingo Gonzales bring this complaint under the Federal Tort Claims Act, 28 U.S.C. § 2674. Plaintiffs complain of the United States and would show the following:

## PARTIES

2.1. This is a medical malpractice case that arises out of bodily injuries caused by agents and employees of the United States at Brooke Army Medical Center, located at JBSA Fort Sam Houston, San Antonio, Texas (“BAMC”).

2.2. Plaintiffs Odelia A. Gonzales and Domingo Gonzales reside in Devine, Texas, which is within the jurisdiction of this Court. They have been married for over 55 years.

2.3. Defendant is the United States of America, its officers, agents, employees, and representatives.

## JURISDICTION, SERVICE & VENUE

3.1. This Federal District Court has jurisdiction because this action is brought under 28 U.S.C. § 2671–80, commonly known as the Federal Tort Claims Act.

3.2. The United States of America may be served with process in accordance with Rule 4(i) of the Federal Rules of Civil Procedure by serving a copy of the Summons and Complaint on the United States Attorney for the Western District of Texas by certified mail, return receipt requested, at that office:

The United States Attorney's Office
ATTN: Civil Process Clerk
601 NW Loop 410, Suite 600
San Antonio, Texas 78216

3.3. Service is also affected by serving a copy of the Summons and Complaint on the Attorney General of the United States, by certified mail, return receipt requested at:

The Attorney General's Office
ATTN: Civil Process Clerk
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

3.4. Venue is proper in this judicial district under 28 U.S.C. § 1402(b) because the United States of America is a defendant and the acts and omissions complained of in this lawsuit occurred in this judicial district. Further, Plaintiffs reside in this judicial district.

## AGENCY

4.1. This case is commenced and prosecuted against the United States of America to and in compliance with Title 28 U.S.C. §§ 2671–80, the Federal Tort Claims Act. Liability of the United States is predicated specifically on 28 U.S.C. § 2674 because the personal injuries and resulting damages of which the complaint is made were proximately caused by the negligence, wrongful acts and/or omissions of employees and/or agents of the United States of America working for the Department of the Army, while acting within the scope of their office, employment, and/or agency under circumstances where the United States of America, if a private person, would be liable to the Plaintiffs in the same manner and to the same extent as a private individual.

4.2. The United States Department of the Army is an agency of the United States of America.

4.3. The United States of America, through its agency, the Department of the Army, at all times material to this lawsuit, owned, operated, and controlled Brooke Army Medical Center, and staffed it with its agents, servants, or employees.

4.4. At all times material to this lawsuit, including in 2024, providers at Brooke Army Medical Center were acting within the course and scope of their employment when providing treatment to Odelia A. Gonzales.

4.5. In 2024, Brooke Army Medical Center provided care and treatment to Odelia A. Gonzales. Odelia A. Gonzales was a patient of Brooke Army Medical Center, and its providers had a doctor-patient relationship with Odelia A. Gonzales.

4.6. The following individuals were employees of the United States of America or its agency, acting within the course and scope of their employment when they provided treatment to Odelia A. Gonzales: Stuart S. Winkler, MD; Jasmine Jonghui Han, MD; Wendy Chao, MD; Tyler R. Koehn, MD; Timothy R. Fullam, MD; Nathan Weiss, DO; and Emily Nicole Hathaway, MD.

## JURISDICTIONAL PREREQUISITES

5.1. Pursuant to 28 U.S.C. §§ 2672 and 2675(a), the claims set forth here were filed with and presented administratively to the Department of the Army on July 7, 2025.

5.2. The claim of Odelia A. Gonzales set forth a “sum certain” of $5,000,000.

5.3. The claim of Domingo Gonzales set forth a “sum certain” of $5,000,000.

5.4. No exception to the Federal Tort Claims Act, 28 U.S.C. § 2680, bars this lawsuit.

5.5. This lawsuit is filed greater than six months after the presentation of the claims on July 7, 2025.

5.6. Accordingly, Plaintiffs have complied with all jurisdictional prerequisites and conditions precedent to the commencement and prosecution of this suit.

## FACTS

6.1. This is a Federal Tort Claims Action for money damages based on substandard medical care provided by agents and employees of the United States at Brooke Army Medical Center (BAMC) in San Antonio, Texas, to Odelia A. Gonzales, beginning in the summer of 2024. As a result of that care, Ms. Gonzales was misdiagnosed with myasthenia gravis, treated with high-dose corticosteroids she never needed, and suffered a cascade of catastrophic and permanent injuries.

6.2. Ms. Gonzales has a history of Stage IVb HER2-positive uterine carcinosarcoma, for which she was treated at BAMC. Her treating gynecologic oncologist described the disease burden as small volume, noted a good short-term oncologic prognosis, and recognized that treatment options remained available.

6.3. On July 2, 2024, her gynecologic oncology provider at BAMC cleared her to begin a new cancer treatment regimen of lenvatinib and pembrolizumab for disease recurrence in a left external iliac lymph node.

6.4. On July 22, 2024, at a follow-up oncology visit, Ms. Gonzales was found to have an elevated Thyroid-Stimulating Hormone (TSH) of 9.78 uIU/mL, indicating hypothyroidism.

6.5. Hypothyroidism is a well-recognized side effect of the lenvatinib and pembrolizumab regimen Ms. Gonzales was receiving. When the thyroid does not produce enough hormone, the body's muscles do not receive the signals they need to function normally, which can cause proximal muscle weakness (weakness in muscles such as the shoulders, hips, and eyelids) and

periorbital edema (swelling around the eyes caused by fluid buildup in the surrounding soft tissue).

6.6. On or about July 31, 2024, Ms. Gonzales presented to the BAMC emergency department with periorbital edema of approximately five days' duration.

6.7. On August 6, 2024, she called her oncology provider's office reporting swelling around her eye. Her TSH remained elevated.

6.8. On August 12, 2024, Ms. Gonzales presented to her oncology provider reporting progressive worsening fatigue and bilateral lid lag despite starting levothyroxine, and great difficulty completing activities of daily living. Her providers delayed the next cycle of her cancer treatment.

6.9. On August 20, 2024, Ms. Gonzales was admitted to BAMC. She presented in a wheelchair reporting fatigue, weakness, and an inability to open her eyes. Her providers noted that the diagnosis was "most concerning" for the "potential for Myasthenia Gravis," an autoimmune disease.

6.10. Neurology and internal medicine were consulted after admission. The internal medicine consultant noted that her lack of a history of muscular fatigability and the overall timing of onset made myasthenia gravis an "atypical picture," and that further study was needed before favoring one diagnosis over another. Laboratory testing on August 20 showed an elevated creatine kinase (CK) of 683 U/L. He noted that other than her inability to open her eyelids, "she denies explicit visual deficits or ophthalmalgia which is reassuring."

6.11. Neurology examined Ms. Gonzales and noted approximately a two-and-a-half-week history of eyelid drooping and arm fatigability. Examination

found normal cranial nerves, except for bilateral ptosis. Ptosis is the medical term for drooping or sagging upper eyelids. An ice-pack test was performed in response to this exam finding.

6.12. Critically, the ice-pack test was negative, meaning Ms. Gonzales' ptosis did not improve. Neurology expressed low suspicion for myasthenia gravis and noted the risk of respiratory depression and worsening weakness with high-dose steroids. No antibody testing and no electrodiagnostic studies were ordered at that time.

6.13. Establishing the diagnosis of Myasthenia Gravis requires an appropriate testing and workup. The standard of care requires that other potential etiologies be reasonably excluded before the diagnosis is made and before treatment is initiated. Before diagnosing a patient with Myasthenia Gravis and beginning treatment for it, the applicable standard of care required Ms. Gonzales's providers to complete two things: (1) laboratory antibody testing (blood tests that detect the specific antibodies that cause Myasthenia Gravis) and (2) electrodiagnostic studies (nerve and muscle testing that can directly detect the neuromuscular junction problem the disease causes). Given neurology's own low suspicion for the disease, the standard of care required these confirmatory results before starting any Myasthenia Gravis treatment, let alone high-dose steroids.

6.14. Rather than complete that workup, Ms. Gonzales's providers proceeded to treat her for a Myasthenia Gravis diagnosis they had not confirmed.

6.15. On August 21, 2024, pyridostigmine was started. But neurology consult stated “High-dose steroids/Solumedrol would not be indicated from a neurology perspective for myasthenia.”

6.16. The next day, on August 22, 2024, she was seen by BAMC internal medicine staff. The reason for the consultation was noted as “Eval for potential medical etiologies contributing to the patient’s presenting symptoms of profound muscle weakness, bilateral ptosis.” Their assessment differential included: checkpoint-inhibitor toxicity leading to myasthenia gravis or drug-induced ocular myositis. The consult concluded: “The plan is to initiate high-dose steroids for suspected drug-induced [myasthenia gravis], and a cautious approach to further use of high-dose steroids due to potential risks as laid out by neurology.”

6.17. No orders for antibody testing were entered until August 27, 2024, many days after steroids were started. Acetylcholine receptor binding antibodies returned negative on August 29, 2024; blocking antibodies were normal; and MuSK antibodies returned normal on September 6, 2024.

6.18. Had the antibody testing been ordered on August 20, the results would have been available on or about August 22, before steroids were ever started.

6.19. Despite the absence of any confirmatory testing and despite no clinical improvement, Ms. Gonzales’s providers escalated her steroid dosing. Methylprednisolone was increased to 1.5 mg/kg (120 mg) on August 31; to 2 mg/kg (160 mg) on September 1 through 3; to 2.5 mg/kg (200 mg) on September 4; and continued at 192 mg per day thereafter. These doses far exceeded the low-dose steroid regimen that would have been appropriate had

Ms. Gonzales's actual condition been correctly diagnosed. It was these high, unnecessary doses that caused the catastrophic complications described below.

6.20. Intravenous immunoglobulin (IVIG) was also administered, again without a confirmed diagnosis and without improvement.

6.21. Her ptosis did not change during the admission, and Ms. Gonzales did not improve with IVIG. She was discharged on September 5, 2024.

6.22. From August 22 through September 21, 2024, Ms. Gonzales received a total methylprednisolone dose of approximately 4,784 mg.

6.23. The standard of care required Ms. Gonzales's providers to confirm the diagnosis of Myasthenia Gravis before initiating steroids, including through prompt antibody testing and electrodiagnostic studies. It was a breach of the standard of care to diagnose Ms. Gonzales with Myasthenia Gravis on her presentation and without performing that testing. Even the initial dose of steroids violated the standard of care, let alone the escalating high doses of methylprednisolone that followed. The administration of IVIG likewise violated the standard of care.

6.24. Ms. Gonzales did not have Myasthenia Gravis or an immune-related muscle disease caused by her cancer treatment.

6.25. Her eyelid drooping and muscle weakness were instead caused by thyroid myopathy, a recognized and reversible complication of hypothyroidism in which muscles weaken because they lack adequate thyroid hormone.

6.26. Her periorbital swelling further stretched and loosened the tendon that lifts the eyelid, which independently contributed to her drooping eyelids

apart from any muscle weakness. Because Ms. Gonzales had no significant breathing or swallowing difficulty and no evidence of heart muscle inflammation, the complications that make Myasthenia Gravis or immune-related myositis dangerous, the correct and safe course was to treat her underlying hypothyroidism with thyroid hormone replacement and observe her for improvement, not to give her high-dose steroids or IVIG.

6.27. On September 18, 2024, Ms. Gonzales had an outpatient ophthalmology follow up for her ptosis. They documented that "she has not felt any meaningful or significant improvement in her eyelid function" and did not have double vision, decreased vision when eyelids are open, pain with eye movement, weakness official muscles, or difficulty swallowing or breathing. Ophthalmology recommended a single-fiber EMG and further evaluation. That test was never performed.

6.28. Electrodiagnostic testing was not performed until September 23, 2024. The EMG showed no electrodiagnostic evidence of a neuromuscular junction disorder, the type of problem that causes Myasthenia Gravis. It likewise showed no evidence of an inflammatory muscle disease. It instead showed isolated myopathic units, a finding consistent with a muscle-based problem such as thyroid myopathy rather than an autoimmune nerve-signaling disorder. The neurologist recommended discontinuing pyridostigmine and weaning steroids, noting that there was no evidence of immune checkpoint inhibitor-related myositis or myasthenia on the study. Because Ms. Gonzales's clinical presentation had remained essentially unchanged since her August 20 admission, this same result would have been obtained had the test been performed then, before any steroids were ever started.

6.29. On September 21, 2024, Ms. Gonzales returned to the BAMC emergency department with constipation, abdominal pain, and diffuse abdominal complaints. A CT scan revealed findings suspicious for sigmoid colon perforation, with free air in the abdomen. That same day, she underwent an emergency sigmoidectomy with end colostomy (Hartmann's procedure). Pathology confirmed diverticular disease complicated by perforation.

6.30. High-dose corticosteroid therapy is a recognized cause of colonic perforation, steroid myopathy, immunosuppression, impaired wound healing, and gastrointestinal bleeding. Steroids weaken the lining of the colon and suppress the body's normal inflammatory response, which allows small tears in weakened areas of the colon to progress to full perforation while masking the usual warning signs like fever and localized pain that would otherwise prompt earlier diagnosis. This risk increases with the dose and duration of steroid exposure. In this case, these serious complications would not have occurred absent the steroid administrations, or even at low, medically appropriate doses her actual condition warranted.

6.31. Her treating providers documented in the medical record that the sigmoid perforation was likely caused by the high-dose steroids used to treat her ptosis.

6.32. Ms. Gonzales's course continued to deteriorate. On October 20, 2024, she was transferred from a rehabilitation facility back to the BAMC emergency department with acute abdominal pain and bloody stools. A CT scan found rectal pneumatosis coli with adjacent 5cm of gas, suggesting colonic perforation and possible abscess adjacent to the prior sigmoid resection surgical bed. She underwent a second emergency exploratory

laparotomy in the setting of continued steroid use. Blood cultures confirmed bacteremia, and she developed septic shock and acute hypoxic respiratory failure. High-dose corticosteroids also suppress the body's immune system, impairing its ability to fight infection and contain bacteria that escape through a colonic perforation. Ms. Gonzales's continued high-dose steroid use directly contributed to the bacteremia and septic shock that followed her second perforation.

6.33. On November 3, 2024, Ms. Gonzales was found to have a fascial dehiscence of her midline surgical wound, with multiple visible loops of bowel through her fascia, requiring a third emergency exploratory laparotomy with washout, debridement, and fascial closure performed the following day.

6.34. On November 13, 2024, Ms. Gonzales underwent a fourth abdominal surgery for wound washout and debridement.

6.35. On November 21, 2024, Ms. Gonzales was transferred to a long-term acute care facility for continued wound care, where she required negative pressure wound therapy for an open midline abdominal wound and developed stage 3 pressure ulcers.

6.36. On January 8, 2025, she was transferred to another facility for continued wound care and rehabilitation. She developed a left foot equinovarus contracture and became wheelchair dependent, requiring total assistance for basic activities of daily living.

6.37. The high doses of steroids Ms. Gonzales received caused her steroid myopathy, her colonic perforations, and the cascade of complications that followed. Had the proper diagnosis been made, and had she not been treated with high-dose steroids, this catastrophic hospital course would not have

occurred. Even low-dose therapy would not have resulted in the complications she suffered.

6.38. As a proximate result of the substandard care provided by agents and employees of the United States at Brooke Army Medical Center, Ms. Gonzales suffered a misdiagnosis of Myasthenia Gravis, unnecessary high-dose corticosteroid treatment, steroid myopathy, two colonic perforations, an emergency sigmoidectomy with a permanent colostomy, a rectal stump perforation, fascial dehiscence, multiple additional abdominal surgeries, bacteremia, septic shock, acute hypoxic respiratory failure, gastrointestinal bleeding, an open and chronic non-healing abdominal wound, stage 3 pressure ulcers, a left foot contracture, prolonged multi-facility hospitalization, and severe and permanent functional disability.

6.39. Her injuries are permanent in nature and will require ongoing medical care, attendant care, and healthcare expenses.

## CAUSES OF ACTION

7.1. Through its employees, agents, or servants, the Defendant United States of America, was negligent in one or more of the following respects:

a. Negligently failing to timely and properly monitor, care, assess, diagnose, and treat Odelia Gonzales;

b. Negligently failing to timely and properly evaluate and work up Odelia A. Gonzales's presenting symptoms;

c. Negligently failing to timely order and perform antibody testing before initiating treatment;

d. Negligently failing to timely order and perform electrodiagnostic studies, including nerve conduction studies, needle EMG, repetitive nerve stimulation, and single-fiber EMG;

e. Negligently failing to reasonably exclude other potential etiologies, including thyroid myopathy, before diagnosing myasthenia gravis;

f. Negligently diagnosing Odelia A. Gonzales with myasthenia gravis without confirmatory testing;

g. Negligently initiating corticosteroid treatment without a confirmed diagnosis;

h. Negligently administering high-dose corticosteroids far exceeding necessary and proper amounts;

i. Negligently administering intravenous immunoglobulin without a confirmed diagnosis;

j. Negligently failing to timely and properly diagnose Odelia A. Gonzales;

k. Negligently failing to timely and properly treat Odelia A. Gonzales; and

l. Negligently failing to timely recognize and address the complications of high-dose corticosteroid therapy.

7.2. At all times relevant to this lawsuit, the officers, employees, agents, or representatives of the United States were negligent and caused the injuries and damages sustained by Plaintiffs.

## DAMAGES

8.1. Because of Defendant's negligence, Plaintiff Odelia A. Gonzales has suffered, and continues to suffer, severe injuries, including past and future physical and mental pain and suffering; past and future medical, healthcare, and attendant care expenses; past and future physical disfigurement; past and future permanent physical impairment; loss of enjoyment of life; and out of pocket expenses and other pecuniary losses. Such injuries are, in reasonable probability, permanent.

8.2. Plaintiffs bring this suit to recover all damages cognizable under the applicable state and federal law resulting from the injuries to Ms. Gonzales.

8.3. Because of the negligence of the United States employee healthcare providers, Odelia A. Gonzales sustained damages and injuries including:

a. Past and future medical, health care and attendant care expenses;
b. Past and future physical pain and suffering;
c. Past and future mental suffering, pain and anguish;
d. Past and future physical impairment;
e. Past and future physical disfigurement;
f. Past and future permanent injury;
g. Past and future loss of enjoyment of life; and
h. Other pecuniary damages.

8.4. In addition, Ms. Gonzales seeks recovery of all other damages to which she is entitled under the applicable federal and state laws.

8.5. Because of the negligence of the United States employee healthcare providers, Ms. Gonzales' husband, Domingo Gonzales, sustained damages and injuries including:

a. Past and future loss of household services;
b. Past and future loss of consortium;
c. Othe pecuniary damages.

8.6. In addition, Mr. Gonzales seeks recovery of all other damages to which he is entitled under the applicable federal and state laws.

8.7. Plaintiff does not seek pre-judgment interest or punitive damages. *See* 28 U.S.C. § 2674.

## RELIEF REQUESTED

9.1. Plaintiffs request that the United States be cited in terms of law to appear and answer this lawsuit. Upon final trial, Plaintiffs seek judgment against the United States for the amount of actual damages and for such other and different amounts that they shall show by proper amendment before trial; for post-judgment interest at the applicable legal rate; for all Court costs incurred in the prosecution of this lawsuit; and for such other relief, in law or equity, both general and special, to which Plaintiffs may show themselves entitled to and to which the Court believes them deserving.

Respectfully Submitted,

/s/ Tom Jacob

TOM JACOB
tom@trial.law
Texas State Bar # 24069981
STEVEN HASPEL
steven@trial.law
Texas State Bar # 24109981
NATIONAL TRIAL LAW, PLLC
1114 Lost Creek Blvd., Suite 410
Austin, TX 78746
512-476-4346
*Attorneys for Plaintiffs*